**UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE ASBESTOS PRODUCTS ) | MDL DOCKET NO.: MDL 875 |
| LIABILITY LITIGATION (NO. VI) ) | Transfer State: Wisconsin |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

The Estate of ROBERT J. DION, by its
Special Administrator CHRISTINE M.
DION,

                      Plaintiffs,

       v.

AMCHEM PRODUCTS, et al.,

                      Defendants.

Civil Action No. 2:10-CV-64681
Civil Action No. 2:10-CV-64683
Civil Action No. 2:10-CV-64683

---

**GENERAL ELECTRIC COMPANY'S MEMORANDUM OF LAW IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

---

Defendant, General Electric Company ("GE" or "Defendant"), submits the following memorandum of law in support of its motion for summary judgment pursuant to Fed. R. Civ. P. 56.

**I.  INTRODUCTION.**

Plaintiff Christine M. Dion, individually and as Administrator of the Estate of her deceased husband Robert J. Dion ("Plaintiff"), filed this action on August 4, 2009 in Milwaukee County Wisconsin Circuit Court against GE and various other defendants.  The case was

subsequently removed to the United States District Court for the Eastern District of Wisconsin[a] and then transferred to the MDL in this Court. Plaintiff's Complaint alleges that Robert J. Dion ("Dion") was exposed to asbestos from defendants' products while working as machine operator at Ansul, Inc. (n/k/a Tyco International, Ltd.) ("Tyco") from 1953 to April 28, 1989. (Ex. A Complt. ¶ 69.) Although not alleged in the Complaint, Plaintiff's responses to discovery also allege that Mr. Dion was exposed to asbestos during his service in the Navy from 1946 to 1947. (Ex. B.)

For the reasons discussed below, Plaintiff's claims against GE should be dismissed because no genuine issues remain as to any viable claim against GE under applicable law. GE is entitled to summary judgment for two reasons: (1) There is no evidence that the decedent was exposed to asbestos associated with any product manufactured by GE, much less that any such exposure substantially contributed to the decedent's injury and (2) the federal contractor defense, as set forth in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), and explicated in *Faddish v. General Electric Co.*, 2010 WL 4146108 (E.D. Pa. Oct. 20, 2010) (Ex. D-2), shields GE from any claims arising from marine naval turbines/ships service turbo generators ("SSTGs") that GE manufactured and supplied the Navy. Plaintiff has not identified any SSTGs allegedly manufactured by GE, but any potentially at issue were manufactured and supplied pursuant to specifications of the United States Navy; there is no evidence that the turbines/SSTGs did not comply to those specifications; and there is no evidence that at the time in question GE had knowledge about any dangers from asbestos products specified by the Navy, superior to and

---

[a] Defendant Leslie Controls, Inc. ("Leslie") filed a Notice of Removal on December 30, 2009 alleging jurisdiction under 28 U.S.C. §§ 1441 and 1442(a)(1), based on Plaintiff responding to Leslie's discovery that Mr. Dion served in the US Navy from February 13, 1946 to December 11, 1947 and was exposed to asbestos during that service. (*See* Declaration of Nora E. Gierke ("Gierke Decl."), Ex. B.) All further references to "Ex. ___" are attached to the Gierke Decl., filed in support of this motion.

above and beyond that already known by the United States Navy.

## II. FACTUAL BACKGROUND.

### A. The Plaintiff And General Work History.

Plaintiff Christine M. Dion is the widow of Robert J. Dion and brings this action as personal representative on behalf of his Estate. (Ex. A, Complt. ¶ 1.) Ms. Dion brought this action alleging that Mr. Dion was diagnosed with mesothelioma on or about August 4, 2006 and subsequently died on August 31, 2006. (*Id.* ¶¶ 1, 70.) Plaintiff's Complaint alleges that Mr. Dion's mesothelioma was caused by exposure to various defendants' products during his career as a machinist at Tyco in Marinette, Wisconsin from March 3, 1953 to April 28, 1989. (*Id.* ¶ 69.)

Plaintiff also alleges in response to discovery that Mr. Dion's mesothelioma was caused by exposure to asbestos during his naval service from February 13, 1946 to December 11, 1947. (Ex. B, Answer to Leslie's RFA No. 1.) Although the discovery responses do not specify particular ships, military records produced in response to third party discovery show that Mr. Dion served aboard the USS Dyess and USS O'Hare from 1946-1947. (*See* Ex. C, Notice of Separation from US Naval Service.)

### B. Plaintiff's Allegations Against GE.

Plaintiff's Complaint names various defendants who allegedly made asbestos-containing products to which Plaintiff claims Mr. Dion was exposed. (Complt. ¶¶ 2-72.) However, with regard to all the defendants, including GE, the Complaint fails to identify any specific products to which Plaintiff claims Mr. Dion was exposed. (*Id.*)

Based on the above allegations, Plaintiff asserts claims against GE, for strict product liability (Count I), negligence (Count II) and punitive damages (Count IV). (*Id* at ¶¶ 73-81, 87-88.)

There is no fact witness testimony to establish that Mr. Dion work with or around any asbestos-containing products manufactured by GE. Mr. Dion was not deposed prior to his death. And, Plaintiff has not identified or deposed any fact witnesses. Discovery is now closed. As such, there is no evidence to support the conclusion that any GE products could have exposed Mr. Dion to asbestos. Based on the above, this Court should grant GE's summary judgment motion because Plaintiff cannot prove that a GE product caused Mr. Dion's disease. Additionally, to the extent that Plaintiff is alleging Mr. Dion was exposed to a GE product during his naval service, Plaintiff's claims should be dismissed pursuant to the federal general contractor defense.

### III. ARGUMENT.

#### A. Summary Judgment Standard.

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate and shall be rendered, "… if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(e) provides, that in response to a motion for summary judgment "the adverse party may not rest upon the mere allegations or denials of its pleadings that, but its response, by affidavits or otherwise must set forth specific facts showing there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." Fed. R. Civ. Proc. 56(e).

The moving party has the initial burden of identifying for the court those portions of the record that it believes demonstrate the absence of dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In order to defeat a motion for summary judgment, the non-moving party must produce evidence such as that a reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). As set forth below in Section III.B, under maritime law, in an asbestos action, the evidence must be sufficiently

particularized to establish a plaintiff's exposure to a defendant's product which contained asbestos. Direct evidence is required concerning the presence and manner of use of a defendant's product in the areas of the job site where plaintiff was present, at the time that the asbestos products were being used. The plaintiff must link the plaintiff with the defendant's product. *See infra* at 10.

Here, Plaintiff's claims should be dismissed because Plaintiff has failed to come forward with sufficient evidence to support the causation element of his claims against GE.

### B. Maritime Jurisdiction, And Substantive Maritime Law, Apply To This Case.

In three recent Memorandum Orders, this Court has held that federal maritime jurisdiction, and substantive maritime law, apply to personal injury claims for alleged exposure to asbestos based on the maintenance or repair of naval vessels on navigable waters or in dry dock. Where the alleged factual scenario points to maritime jurisdiction, substantive maritime law--rather than the state law of the forum state--is applicable, regardless of the initial pleadings or contentions of the parties. *Gibbs v. Carnival Cruise Lines*, 314 F 3d 125, 132-133 (3rd Cir. 2002). In the instant matter, the factual scenario is materially indistinguishable from those cases in which the Court has applied maritime jurisdiction and substantive maritime law.

Specifically, the MDL Court has now held: (1) that federal maritime jurisdiction and substantive maritime law--rather than state law of the original forum state--apply to naval cases based on alleged exposure to asbestos while on vessels on navigable waters or in dry dock, *Sweeny v. Saberhagen Holdings, Inc.*, 2011 WL 346822 (E.D. Pa. 1/13/2011)(Strawbridge, Mag.), *adopted*, 2011 WL 359696 (E. D. Pa. 2/3/2011); (2) that where federal maritime law applies, *see Lindstrom v. A-C Product Liability Trust*, 424 F. 3d 488 (6th Cir. 2005), an equipment manufacturer is not liable for any asbestos insulation used to insulate its equipment

(*e.g.* turbines) which it did not manufacture, sell, or distribute but was later placed on the equipment, *Delatte v. A. W. Chesterton Co.*, No. 2:09-cv-69578ER (E.D. Pa.)(Order, 2/28/2011)(Doc. 241); and (3) similarly, where maritime law applies, equipment manufacturers (such as pumps) are not liable for exposure to replacement asbestos gaskets or packing which they did not manufacture, sell, or distribute, *Ferguson v. Lorrilard Tobacco Co., Inc.*, No. 2:09-cv-91161ER (E.D. Pa)(Order, 2/28/2011)(Doc. 234).

### 1. Maritime Jurisdiction.

In *Sweeny*, a naval engineman alleged he performed maintenance and replaced valves on the submarine USS *Redfin* and other submarines from 1973-1946. The Court held that maritime jurisdiction applied based on plaintiff's assertions that his exposure to asbestos occurred at sea, or while working on vessels docked at naval shipyards.

In Magistrate Strawbridge's opinion in *Sweeney*, adopted by District Judge Robreno in an Order entered on February 3, 2011, 2011 WL 359696, the Court surveyed the controlling authorities and set forth in detail the parameters of maritime jurisdiction as applied to naval service asbestos claims under the "locality/maritime connection" test. 2011 WL 346822 at pp. *4-*6. With regard to the location aspect of the test, the Court in *Sweeny* stated:

> The "location test" requires that either "the tort occurred on navigable water" or that the "injury suffered on land was caused by a vessel on navigable water." [quoting *Grubart v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1997)] We agree with the clear weight of authority that, in the context of a toxic tort case, the location test is resolved by consideration of whether the alleged exposures to the toxic substance occurred onboard a naval vessel on the navigable waters or not. [citations omitted] Plaintiff's alleged exposures in this case all occurred on ships in navigable water, whether in the ocean or at dock in a shipyard. *Sisson v. Ruby,* 497 U.S. 358, 362-63, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990) (finding that a ship docked at a shipyard satisfies the location test). Accordingly, the location test is satisfied.

*Sweeney* at p. *4.  As pointed out in *Sweeny*, a tort which occurs on a ship in dry dock occurs on "navigable" waters and meets the "locality" test for maritime jurisdiction.  *Sea Vessel, Inc. v. M/V Sea Lion*, 23 F. 3d 345, 348-350 (11th Cir. 1994)(collecting Supreme Court precedent and holding that a ship in dry dock is on "navigable waters" for purposes of admiralty jurisdiction); *Vasquez v. GMD Shipyard Corp.*, 582 F. 3d 293, 298-299 (2nd Cir. 2009)(holding Supreme Court cases remain good law and that a ship under repair in dry dock is on "navigable" waters and meets the locality test.).  Moreover, the Court in *Sweeny* held the "connection test" for maritime jurisdiction was clearly met.  The plaintiff's allegations of exposure to asbestos occurred during the installation and maintenance of equipment on a naval vessel implicated unsafe working conditions--with a potentially disruptive impact on maritime commerce--and the activities pertained to the repair of a ship, which are consistently held to constitute a maritime activity.  *Id*. at p. *5.

Accordingly, federal maritime jurisdiction was applicable to Sweeny's asbestos claim. *See also, Delatte*, slip op. at 2 (machinist mate on carrier *Franklin D. Roosevelt* alleged he was exposed to insulation on Westinghouse turbines; maritime jurisdiction and law applied as the "alleged exposures which are relevant . . . occurred while Mr. Delatte was serving on various ships in the U. S. Navy," citing *Sweeny*); *Ferguson*, slip op. at 2 (maritime jurisdiction applied where plaintiff served on destroyer  USS *Robert Paine* from 1943-1946 and the alleged exposure attributable to Ingersoll-Rand pumps "occurred aboard U. S. Navy ships in navigable waters," citing *Sweeny*).

In the instant action, Plaintiff alleges that Mr. Dion was exposed to asbestos while

serving in the Navy from 1946-1947 on the USS Dyess and USS O'Hare. Under the foregoing rulings of the Court, and the Supreme Court and other authorities cited therein, maritime jurisdiction must be held to apply in this matter.

### 2. Where Maritime Jurisdiction Exists, Substantive Maritime Law Applies.

As recognized by the Court in *Sweeny, Delatte*, and *Ferguson*, where maritime jurisdiction exists, maritime substantive law applies, not the substantive state law, or the choice of law, of the transferor jurisdiction or forum state. *Gibbs v. Carnival Cruise Lines*, 314 F 3d 125, 132-133 (3rd Cir. 2002); *East River Steamship Corp. v. Transamerica DeLeval, Inc.*, 476 U.S. 858, 864, 106 S. Ct. 2295 (1986)("with admiralty jurisdiction comes the application of substantive admiralty law . . . [a]bsent a relevant statute, the general maritime law, as developed by the judiciary applies"). This is true regardless of the initial contentions of the parties as to the applicable law. In *Gibbs*, where both parties initially relied only on the state law of the forum state, the Third Circuit held:

> Since we conclude that this case sounds in admiralty, we apply federal admiralty law and not the law of New Jersey or any other state. That the District Court took this case under diversity jurisdiction rather than admiralty jurisdiction under 28 U.S.C. § 1333, does not affect this determination. *See Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 410-11, 74 S.Ct. 202, 98 L.Ed. 143 (1953)(holding that courts apply substantive admiralty law to claims that sound in admiralty regardless of whether the complaint invokes diversity or admiralty jurisdiction); *Edynak v. Atlantic Shipping, Inc.*, 562 F. 2d 215, 221 n. 11 (3d Cir. 1977). Thus, for cases such as this that sound in admiralty, we need not look to the general choice of law rules articulated in *Erie R.R. Co. v. Tomkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and *Klaxon, supra*, that typically apply to suits brought in diversity jurisdiction. *See Scott v. Eastern Air Lines, Inc*. 399 F. 2d 14, 25 (3d Cir. 1968)(noting that "admiralty standards define liability for a maritime tort, whether the proceeding is instituted in admiralty or on the law side of the court").

314 F. 3d at 132-133.

### 3. Under Federal Maritime Law, a Manufacturer of Equipment Supplied to the Navy, Such as GE, May Not Be Held Liable For Asbestos Products it Did Not Manufacture or Sell, And a "Mere Minimal Exposure" to Asbestos is Insufficient.

As recognized by the MDL Court in *Sweeny, Delatte*, and *Ferguson*, the standards of federal maritime law as applied to asbestos personal injury and product liability claims are properly reflected by the federal court decisions in *Lindstrom v. A-C Product Liability Trust*, 424 F. 3d 488 (6th Cir. 2005), *aff'g*, 264 F. Supp. 2d 583, 595-596 (N.D. Ohio 2003), and *Stark v. Armstrong World Indus., Inc.*, 21 Fed. Appx 371, 2001 WL 1216977 (6th Cir. 2001). Moreover, as maritime law is based on an "amalgam" of federal and state decisions, *East River Steamship*, 476 U.S. at 865, the decisions in *Lindstrom* and *Stark* are further reflective of, and consistent with, core principles concerning such issues as the lack of a duty to warn of third party products that have been recognized in numerous state court cases.

The maritime law standards set forth in *Lindstrom* and this Court's decisions in *Delatte* and *Ferguson* are dispositive regarding any possible claims of plaintiff based on alleged exposure to asbestos asserted to be attributable to a GE naval turbine.

First, a manufacturer of equipment supplied to the Navy is legally responsible only for the product that it supplied; it is not responsible for injuries caused by parts or insulation "which it neither manufactured nor distributed" but is later p to its equipment. *Delatte*, slip op. at 5-6, *citing Lindstrom*, 424 F. 3d at 494-495. Accordingly, a manufacturer is not liable for any exposure to asbestos from insulation later placed by the shipbuilder or Navy on equipment that was shipped "bare metal" to the Navy. *See Delatte, supra* (recognizing "bare metal defense" under maritime law and holding

summary judgment proper where there was "no evidence showing that defendant manufactured or distributed any of the asbestos used to insulate these turbines.")

Second, by the same token, under maritime law an equipment manufacturer will not be held legally responsible for "replacement parts" manufactured and distributed by others. *Sweeny,* 2011 WL 346822 at p. *6. Such replacement parts would include items as asbestos-containing gaskets and packing. *See Ferguson*, slip op. at 5-6.

Third, under maritime law, for product identification and causation, "a mere 'minimal exposure' to a defendant's product" is not sufficient, *Lindstrom*, 424 F. 3d at 492; *Sweeny* at p. *6. *See also Lohrmann v. Pittsburgh Corning Corp.*, 782 F. 2d 1156 (4th Cir. 1986) (asbestos claimant must demonstrate a frequency, regularity, and proximity of exposure to asbestos attributable to manufacturer's product). It is clear that a "mere showing that defendant's product was present somewhere at plaintiff's place of work is insufficient." *Sweeny* at p. *6.

Fourth, because under maritime law an equipment manufacture is not liable for products it did not manufacture, the corollary rule--that a manufacturer has no duty to warn of hazards of a third party product--recognized in numerous state court cases--plainly applies.

The principles of maritime law set forth in the appeals court decisions in *Lindstrom* and *Stark* and adopted by this Court also plainly reflect the national rule of product liability law recognized in numerous state court and other federal court cases, *see, e.g.*, *Braaten v. Saberhagen Holdings*, 198 P. 3d 493 (Wash. 2009) (collecting cases); *Simonetta v. Viad Corp.*, 197 P. 3d 127 (Wash. 2008); *Long v. Cottrell, Inc.* 265 F. 3d 663, 669 (8th Cir. 2001) (Missouri courts require that the entity place a product into

stream of commerce before it can be held liable for asbestos-containing products, such as insulation or packing, that they did not manufacture, supply, or install); *Peterson v. Superior Court*, 10 Cal. 4th 1185, 1197-2000 (Cal. 1995)(strict liability does not extend beyond chain of distribution of defective product); *Lindstrom v. A-C Products Liability Trust*, 264 F. Supp 2d 583, 595-596 (N.D. Ohio 2003)(pump manufacturer could not be held liable for asbestos contained in another manufacturer's products, though other product was attached to defendant's product), *aff'd*, 424 F. 3d 488 (6th Cir. 2005); *Taylor v. Elliot Turbomachinery Co.*, 171 Cal. App 4th 564 (Cal. App. 2009)(equipment manufacturer had no duty to warn, either in negligence or strict liability, of hazards posed by asbestos-containing external insulation, pipe flange gaskets, or internal gaskets and packing to which Navy sailor was exposed aboard USS *Hornet* but which equipment manufacturer did not place in chain of distribution); *Firestone Steel Products Co. v. Barajas*, 927 S.W. 2d 608 (Tex. 1996) (a "manufacturer generally does not have a duty to warn or instruct about another manufacturer's products"); *Fricke v. Owens-Corning Fiberglass Corp.*, 618 So.2d 473, 475 (La. App. 1993)(manufacturer had no duty to warn about product that it neither manufactured nor sold); *Ford Motor Co. v. Wood*, 703 A.2d 1315, 1331-32, 119 Md. App. 1 (1998) (expressly refusing to hold that a manufacturer "has a duty to warn of the dangers of a product that it did not manufacture, market, sell or otherwise place into the stream of commerce"); *Garman v. Magic Chef, Inc.*, 117 Cal.App.3d 634, 173 Cal. Rptr. 20 (Cal. App. 1981) (manufacturer is not liable for failure to warn of risk of harm from use of its product--a gas stove-- in conjunction with another product--a leaky gas line--which because of a defect or unsafe use is itself unsafe); *Brown v. Drake-Willock Intern., Ltd.*, 530 N.W. 2d 510 (Mich. App. 1995) (maker of dialysis

machines not liable for failing to warn of exposure to formaldehyde used to clean machines); *see also In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 97 F.3d 1050 (8th Cir.1996); *Kremer v. Duriron Co.*, 40 Ohio App.3d 183, 532 N.E.2d 165 (1987); *Kellar v. Inductotherm Corp.*, 498 F. Supp. 172, 175 (E.D. Tenn. 1978).

### C. UNDER MARITIME LAW, GE IS ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFF CANNOT ESTABLISH THAT ANY GE PRODUCT CAUSED MR. DION'S INJURY.

Under maritime law, for product identification and causation, "a mere 'minimal exposure' to a defendant's product" is not sufficient, *Lindstrom*, 424 F. 3d at 492; *Sweeny* at p. *6. *See also Lohrmann v. Pittsburgh Corning Corp.*, 782 F. 2d 1156 (4th Cir. 1986) (asbestos claimant must demonstrate a frequency, regularity, and proximity of exposure to asbestos attributable to manufacturer's product). It is clear that a "mere showing that defendant's product was present somewhere at plaintiff's place of work is insufficient." *Sweeny* at p. *6.

Since neither Mr. Dion (who was not deposed prior to his death), nor any other witnesses, have been offered to identify any GE asbestos-containing product to which Mr. Dion was exposed, Plaintiff's claims against GE should be dismissed.

Here, Plaintiff cannot avoid summary judgment by merely asserting that Mr. Dion and a product manufactured by GE could have been at the same job site. Rather, Plaintiff must provide evidence to show that Mr. Dion actually worked with or around an allegedly *asbestos-containing* product from GE and must offer evidence that establishes a frequency, regularity, and proximity of exposure to asbestos attributable to GE's product.

Here, Plaintiff cannot meet this standard and, thus, GE is entitled to summary judgment. Plaintiff does not have evidence that Mr. Dion ever worked with or around a GE product at any of the jobsites identified. As such, Plaintiff cannot support the causation element of its claims against GE and the Court should dismiss those claims.

### D. ALTERNATIVELY, GE IS ENTITLED TO SUMMARY JUDGMENT PURSUANT TO THE GOVERNMENT CONTRACTOR DEFENSE.

GE also is entitled to summary judgment on all claims pursuant to the government contractor defense. This Court's recent decision in *Faddish v. General Electric Co.*, 2010 WL 4146108 (E.D. Pa. Oct. 20, 2010) (Ex. D-1), is dispositive of Plaintiffs' claims. In *Faddish*, the Court granted GE's motion for summary judgment and found as a matter of federal law that GE was immune from asbestos state law tort liability and failure to warn claims regarding turbines it supplied to the Navy, pursuant to standards articulated in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 512 (1988). Under *Boyle*, a military contractor is immune from tort claims if (1) the United States government approved reasonably precise specifications for the product at issue; (2) the equipment conformed to those specifications; and (3) the contractor warned the United States about the dangers in the use of the equipment that were known to it, but not known to the United States. The Court in *Faddish* found that GE's "extensive" evidentiary showing satisfied the government contractor defense, and it confirmed the proper legal standards which are to be applied in assessing the viability of the defense in asbestos and failure to warn claims. *Faddish*, at **7, 9. Among other things, *Faddish* expressly rejected the plaintiff's contention that GE would have to demonstrate that it was prohibited by the Navy from placing a warning about any hazard from asbestos on its turbines for the military contractor defense to apply. *Faddish*, 2010 WL 4146108 at *8.

In the instant matter, GE has submitted the same evidentiary materials in support of its motion that were before the Court in *Faddish*, (Exs. D-2 through D-15), and that entitled it to summary judgment in that case. The very same principles regarding

government contractor apply in this matter.

In *Faddish*, a wrongful death/mesothelioma case transferred to MDL-875 from the Southern District of Florida, the plaintiff's decedent served in the Navy aboard the aircraft carrier *USS Essex* (constructed in 1942) from May 1958 to October 1961. John Faddish claimed asbestos exposure by having "cleaned up" and worked around SSTGs manufactured and supplied to the Navy by GE. *Faddish*, 2010 WL 4146108 at *1.

With regard to GE's military contractor defense, the Court found that GE's evidentiary materials clearly established the Navy's control over and approval of military specifications for GE's naval marine turbines, that GE's turbines conformed to and could not depart from those specifications, and that the Navy itself was the state-of-the-art leader with regard to knowledge of any hazards from asbestos. *Faddish,* 2010 WL 4146108 at ** 6-9. Unsurprisingly, given that the named turbo generators at issue in *Faddish* are at issue in the present case, the Court's reasoning is fully applicable here.

First, the United States government approved reasonably precise specifications for the marine turbines. GE's marine turbines formed important and necessary parts of naval vessels' main propulsion and electrical power generation systems. The detailed Declarations of Ben J. Lehman (Rear Adm. U.S.N., Ret.), (Ex. D-4), and former GE engineer David Hobson, (Ex. D-2), explain the Navy's control of the military specification process and technical drawings with regard to naval equipment and GE marine turbines. Admiral Lehman's Declaration at ¶¶ 7-8 states:

> 7. By the 1940s and afterward, the Navy had complete control over every aspect of each piece of equipment used on Navy ships. Military specifications governed every characteristic of this equipment, including the instructions and warnings for equipment. Drawings for nameplates, texts of instruction manuals, and every other document relating to the construction, maintenance, and operation of the vessel were

14

approved by the Navy. This control included the decision of what warnings should or should not be included. Thus, the Navy controlled the decision making with respect to instructions and warnings on every piece of equipment.

8. Furthermore, the Navy had specifications as to the nature and content of all written material that was delivered with each piece of equipment, including turbines and turbine manuals. The Navy was intimately involved with and had final approval of all technical and engineering drawings, operating manuals, safety or hazard information, and any other written information that accompanied a piece of equipment. The Navy determined the nature of hazards to be subject to any precautionary labeling and the content of any such labeling. The "General Specifications" mandated that all equipment manuals must be approved by the Navy's Bureau of Ships, and that no changes could be made without the Navy's approval. When issued later, MIL-M-15071D confirmed this. In short, the Navy dictated every aspect of the design, manufacture, installation, overhaul, written documentation, and warnings associated with its ships and did not permit deviation by any of its contractors.

David Hobson's Declaration, Ex. D-2, at ¶¶ 5, 7, 8, and 10, provides in part as follows:

5. Navy warships are designed and built to have life spans measured in decades. Their planning and design takes many years, with additional years devoted to construction. Accordingly, the U.S. Navy is intimately involved in, and has absolute control over, even the smallest details of planning, design, and construction of its ships, as well as all the major equipment that goes into those ships, including Navy turbines. The intense level of Navy control over these small details far exceeds anything seen in the realm of civilian products.

7. During all aspects of its Navy turbine work, GE performed under the immediate supervision of the Navy through such NAVSEA officers and personnel. Supervision and control were exercised through contract documents, design construction drawings, written specifications, and personal oversight of GE's work by engineers and machinery specialists employed by the U.S. Navy. No aspect of the design, manufacture, and testing of Navy turbines escaped this close control.

8. Of particular note in any discussion of the extensive level of control that the Navy exerted over design and manufacture of Navy turbines are Military Specifications. These are exceptionally detailed specifications promulgated by the government consisting of tens of thousands of pages that spell out in minute detail the Navy's requirements

15

concerning every aspect of the materials and composition of devices like Navy turbines. A government contract for a Navy turbine would incorporate the pertinent Military Specifications, thus binding GE to follow them to the letter. Other Military Specifications dictated and controlled the work of the Navy's shipbuilder and that of the vendors of virtually every other item that went into the ship.

10. In the design phase of a Navy turbine project, as in all other phases, the Navy retained ultimate decision making authority. The initial work was done by Navy personnel, including naval engineers, working on the basis of the planned mission for the new ship and the Navy's own vast accumulated body of knowledge gained from operating warships around the world in all conditions. In due course, the Navy would bring a turbine manufacturer such as GE into the process. By the time a Navy turbine manufacturer began to participate in the design phase of a new turbine, the Navy had already established numerous engineering parameters. Thereafter, the turbine manufacturer and the Navy collaborated on filling in countless additional design details. But in the event any disagreement arose about a particular design issue, the Navy had the final say and controlled the design that was ultimately adopted. All final design drawings and specifications related to a Navy turbine required express U.S. Navy approval per Military Specifications.

With regard to the Navy's reasonably precise specifications for warnings, the Court in *Faddish* found that the declarations of Admiral Lehman, David Hobson, and Captain Betts controlling. The Court pointed out that Navy approval and control "included the decision of what warnings should or should not be included," and that under specifications, regulations, and practice in the field, GE was not permitted "to affix any type of warning to a Navy turbine that addressed alleged hazards of products." *Faddish*, 2010 WL 4146108 at **7-8. Moreover, military specifications establish that marking information for naval equipment had to be in accord with naval descriptions and that technical manuals on safety information had to be approved by the Navy. The Court in *Faddish* summarized:

> GE has produced a record establishing that the United States Navy was intimately involved with both the labeling of equipment on its ships and the manufacturer-produced information that was allowed

16

> to accompany any product. GE has produced military specifications (MIL-I-15024) referring to turbines in particular, and the parameters of a label that could be placed on that equipment. Plaintiff is correct in asserting that Defendants must show something more than "reasonably precise specifications" in a failure-to warn-case. In the instant case, GE has made such a showing.

*Faddish*, 2010 WL 4146108 at *7.

Second, the naval marine turbines conformed to the Navy's specifications. Specifically, the Court in *Faddish* found that "… GE has produced a record establishing that the United States Navy was intimately involved with both the labeling of equipment on its ships and the manufacturer-produced information that was allowed to accompany any product. GE has produced military specifications (MIL-I-15024J) referring to turbines in particular, and the parameters of a label that could be placed on that equipment." *Faddish*, 2010 WL 4146108 at *8.

Third, with respect to the third prong of the government contractor defense, the Court in *Faddish* held that, pursuant to the Declaration of Lawrence Stillwell Betts (Captain, U.S.N., Ret.) MD, Ph.D, CIH, FACOEM, GE had demonstrated that the Navy itself possessed state-of-the-art knowledge of the hazards of asbestos. *Faddish*, 2010 WL 4146108 at *9. It concluded:

> Specifically, regarding the hazards of asbestos, the Navy was intimately involved with the warnings to be given and the procedures to follow, and GE produced significant evidence showing that the Navy possessed state-of-the-art knowledge regarding the hazards of asbestos. Under these circumstances, GE's state law duty to warn was displaced by the Navy's directives.

*Id*.

Finally, the Court in *Faddish* rejected plaintiff's contention that GE must show that the Navy prohibited it from placing warnings about asbestos on its turbines before it

would be entitled to the federal contractor defense.  In doing so, the Court expressly rejected *Dorse v. Eagle-Pitcher Industries, Inc*., 898 F 2d 1487 (11th Cir. 1990), noting that this standard "has been rejected by every Circuit Court to consider the issue, as well as district courts in this circuit." *Faddish*, 2010 WL 4146108 at *8.  Instead,

> [T]he prevailing view is that an independent contractor does not have to show an express government prohibition on all warnings, but rather, must establish that the government "exercised its discretion" regarding warnings to be placed on defendant's product.

GE met that correct legal standard.  *Faddish*, 2010 WL 4146108 at *9.

Thus, GE has made the same evidentiary showing in this matter based on the same exhibits before the Court in *Faddish*, and under the applicable legal standards for government contractor set forth there, it is likewise entitled to summary judgment in this matter.

## II. CONCLUSION

For the reasons set forth above, Defendant GE respectfully requests that the Court grant its motion for summary judgment and dismiss Plaintiff's claims against GE with prejudice.

Dated this 22nd day of March, 2011.

s/
Nora E. Gierke
WI State Bar ID No. 1033618
ngierke@reinhartlaw.com
Christopher P. Banaszak
WI State Bar ID No. 1023178
cbanasza@reinhartlaw.com
Reinhart Boerner Van Deuren s.c.
1000 North Water Street, Suite 1700
Milwaukee, WI 53202
Telephone:  414-298-1000
Facsimile:  414-298-8097
**Attorneys for Defendant**
**General Electric Company**

REINHART\6249293